UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 13-cr-71(3) (RHK/LIB) |
| v. | **REPORT AND RECOMMENDATION** |
| (3) Brian W. Holthusen, | |
| Defendant. | |

This matter came before the undersigned United States Magistrate Judge upon Defendant's Motion to Dismiss the Indictment, [Docket No. 67]; his Motion to Dismiss Indictment Due to Selective Prosecution, or for Additional Discovery, [Docket No. 71]; and his Motion to Suppress Statements, Admissions, and Answers, [Docket No. 57]. The case has been referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on July 2, 2013, regarding the Defendants' motions for discovery,[1] dismissal, and suppression. For reasons outlined below, the Court recommends the motions be **DENIED**.


I.      **BACKGROUND**

Brian W. Holthusen ("Defendant") is one of three persons charged with one count each of Transportation, Sale and Purchase of Fish Taken in Violation of United States Regulation, in violation of 16 U.S.C. §§ 3372(a)(1) and 3373(d)(1), and 25 C.F.R. §§ 242.2 and 242.4. (Indictment [Docket No. 1] at 1-3). Defendant was indicted on April 9, 2013, and made the present motions on June 20, 2013, and July 1, 2013. The Court held an evidentiary hearing on

---

[1] Defendant's discovery motions were the subject of a separate Order. [Docket No. 78].

July 2, 2013, and accepted evidence concerning the suppression motion; the parties were allowed additional time for briefing, and both Defendant and the Government provided supplemental briefs.  (See Docket Nos. 86-87, 92).  Defendant is presently scheduled to go to trial before the Hon. Richard H. Kyle on October 21, 2013.  (See Order [Docket No. 74]).

## II.    DEFENDANT'S MOTIONS TO DISMISS

### A.  Defendant's Motion to Dismiss the Indictment [Docket No. 67]

Defendant Holthusen was indicted as part of "Operation Squarehook," a collaborative effort among officials of the Federal Government, the Leech Lake Band of Chippewa Indians, the Red Lake Band of Chippewa Indians, and the State of Minnesota to investigate and prosecute illegal poaching and marketing of protected fish on the Leech Lake and Red Lake Reservations and in Beltrami, Cass, Clearwater, Itasca, Pennington, and Polk Counties.[2]  Defendant Holthusen is one of ten persons who were indicted in four separate Federal cases: United States v. Brown, No. 13-cr-68 (JRT/LIB); United States v. Reyes, No. 13-cr-70 (JRT/LIB); United States v. Bellefy, 13-cr-71 (RHK/LIB); and United States v. Good, 13-cr-71 (JRT/LIB) (collectively, the "Federal prosecutions").[3]

---

[2] See Defendant's Exhibit. 1, at 2.  **Defendant's Exhibit 1** was offered, and accepted into evidence by the Court, at the July 2, 2013, motions and evidentiary hearing.

[3] In United States v. Brown, Defendant Michael D. Brown is identified in the Indictment as an enrolled member of the Leech Lake Band of Chippewa Indians; the Indictment does not indicate whether Defendant Michael J. Nei is an Indian.

  In United States v. Reyes, Defendants Jerry A. Reyes, a/k/a/ "Otto Reyes," and Marc L. Lyons are identified in the Indictment as enrolled members of the Leech Lake Band of Chippewa Indians, and Defendant Frederick W. Tibbetts, a/k/a "Bud Tibbetts," is identified in the Indictment as an enrolled member of the White Earth Band of Chippewa Indians; the Indictment does not indicate whether Defendant Alan D. Hemme is an Indian.

  The Indictment in United States v. Bellefy does not indicate whether Defendants Larry W. Bellefy, Thomas P. Sumner, or Brian Holthusen are Indians; however, Defendants Sumner and Holthusen identify themselves as enrolled members of the Red Lake Band of Chippewa Indians in their respective motions to dismiss for selective prosecution.

  The Indictment in United States v. Good does not indicate whether Defendant Larry Good is an Indian; however, he identifies himself as an enrolled member of the Red Lake Band of Chippewa Indians in his motion to dismiss for selective prosecution.

Defendant Holthusen first argues that the Federal regulations that form the predicate offense for his Lacey Act prosecution violate his treaty fishing rights and, therefore, are invalid. Additionally, Defendant argues that the Lacey Act does not apply to Indians, and, in the alternative, that even if the Lacey Act applies to Indians, the Government's prosecution of him under the Lacey Act is invalid because the acts that the Indictment alleges he committed, even if true, would merely constitute the lawful exercise of his rights under the Treaty with the Chippewa, 7 Stat. 536 (July 29, 1837) (hereinafter, the "1837 Treaty"), and various other treaties. (See Docket No. 67).[4]

### 1. The Federal regulations concerning commercial fishing on the Red Lake Indian Reservation are valid.[5]

Defendant argues that 25 C.F.R. §§ 242.2 and 242.4 are invalid because they effectively abrogate his treaty guaranteed right to fish on Red Lake. However, Defendant cites no authority, and the Court has found none, for the proposition that the Federal regulations that govern fishing on the Red Lake Indian Reservation or elsewhere in Indian country are unlawful abrogations of Indian fishing rights. In fact, in the only case the Court has found that addresses this particular circumstance, the Ninth Circuit, in United States v. Eberhardt, 789 F.2d 1354 (9th Cir. 1986), upheld both the Federal regulations at issue and their use as a predicate offense for an alleged Lacey Act violation.

---

[4] Seven of the ten defendants in the Federal prosecutions have moved for dismissal of the Indictment on the grounds that they were merely exercising their treaty rights, and at least some have sought to incorporate each other's arguments with regard to these motions. (See, e.g., United States v. Brown, No. 13-cr-68(1), Def.'s Supplementary Mem. Supp. Mot. Dismiss Indictment [Docket No. 69], at 1 ("We respectfully . . . join in the arguments filed on behalf of the Red Lake and Whtie Earth defendants in the 'Operation Squarehook' cases.").

Consequently, references in this Report and Recommendation to Defendant's arguments encompass not only those made by Defendant in the present case, but also to those made by defendants in the related cases.

[5] Defendant in the present case does not, himself, explicitly advance this argument, which is only expressly brought by Defendant Sumner. However, because the Lacey Act, itself, does not prohibit any specific action, but instead merely attaches a Federal criminal penalty to actions otherwise prohibited under Federal or tribal law, the Court construes Defendant's argument as also implicitly challenging the validity of the Federal regulation that governs commercial fishing on Red Lake, and which serves as the predicate offense for his alleged Lacey Act violation.

### a. The Ninth Circuit's decision in <u>Eberhardt</u>.

In <u>Eberhardt</u>, two members of the Yurok Indian Tribe were charged with violating the Lacey Act, the predicate offenses being violations of federal regulations governing commercial fishing within the Hoopa Valley Indian Reservation,[6] which was shared by the Hoopa and Yurok Tribes.[7] <u>Id.</u> at 1356. Those regulations allowed eligible Indians to fish for subsistence and ceremonial purposes, but prohibited commercial fishing. <u>Id.</u> at 1357 (citing 25 C.F.R. 250.8(d)-(e) (1984)). The Defendants challenged their prosecution, arguing that the regulations "were invalid as an unauthorized modification or abrogation of their right to take Klamath River fish." <u>Id.</u> In the U.S. District Court for the Northern District of California, the Magistrate Judge granted their motion to dismiss, and, on the Government's appeal, the District Judge affirmed. <u>Id.</u> at 1357-58 (citing <u>United States v. Wilson</u>, 611 F. Supp. 813 (N.D. Cal. 1985), <u>rev'd</u> <u>Eberhardt</u>, 789 F.2d 1354).

The Ninth Circuit reversed holding that the Department of Interior (hereinafter, "Interior") had the authority to implement the regulations and that the regulations did not abrogate treaty rights. <u>Eberhardt</u>, 789 F.2d at 1359-62.

The <u>Eberhardt</u> court first determined that Interior had the authority to enact the regulations, even without an express statutory grant of such authority. "The validity of the [regulation] depends on whether Congress has given Interior express or implied statutory authority to regulate Indian fishing." <u>Id.</u> at 1359. Although the defendants argued that Congress had not expressly granted Interior the authority to regulate fishing on the Hoopa Valley Reservation, the court found that Congress had delegated to Interior broad authority to manage

---

[6] The regulations at issue in <u>Eberhardt</u> were codified at 25 C.F.R. § 250 (1984), but no longer appear in the Code of Federal Regulations.

[7] Subsequently, in 1988, the Hoopa-Yurok Settlement Act, 102 Stat. 2924 (1988) (<u>codified at</u> 25 U.S.C. §§ 1300i *et seq.*), "divided the Hoopa Valley Reservation into two separate reservations: the Hoopa Valley Reservation and the Yurok Reservation." <u>Short v. United States</u>, 50 F.3d 994, 997 (9th Cir. 1995).

Indian tribal resources under 25 U.S.C. §§ 2[8] and 9,[9] and that the U.S. Supreme Court had "acknowledged Interior's authority to issue fishing regulations under the 'general Indian powers' conferred by 25 U.S.C. §§ 2, 9." Eberhardt, 789 F.2d at 1360-61 (citing Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 691 (1979)); see also United States v. Michigan, 623 F.2d 448, 450 (6th Cir. 1980) (upholding Interior regulations issued pursuant to 25 U.S.C. §§ 2, 9, governing treaty fishing rights in the Great Lakes).

Additionally, the Eberhardt court found that the regulations "are designed to manage the fishery for the benefit of the Indians, not to extinguish any reserved tribal fishing rights." 789 F.2d at 1361. The Court noted that the defendants did not challenge the Hoopa Valley Reservation fishing regulations in their entirety, but instead only challenged the prohibition against commercial fishing. Id. at 1359 (defendants "conceded that Interior has general authority to regulate Indian fishing. They challenge none of the other regulatory provisions, such as restrictions on the type, number, and permissible location of nets, or the catch marking, reporting, and transportation requirements" (citations to the C.F.R. omitted).).[10]

### b. Application of Eberhardt to the present case.

The instant case presents circumstances substantially similar to those in Eberhardt. As in Eberhardt, the specific regulations that Defendant in the present case challenges are part of a comprehensive Federal regulatory scheme that governs fishing on the Red Lake Indian Reservation, where Defendant is a member. Compare Commercial Fishing on Red Lake Indian

---

[8] 25 U.S.C. § 2 provides: "The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations."
[9] 25 U.S.C. § 9 provides: "The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs."
[10] The Eberhardt court declined to reach the question of whether the regulations were arbitrary, capricious, an abuse of agency discretion, or otherwise contrary to law. 789 F.2d at 1362 (citing 5 U.S.C. § 706(2)(A)).

Reservation, 25 C.F.R. § 242 (2013)[11] (Red Lake), with Indian Fishing—Hoopa Valley Indian Reservation, 25 C.F.R. § 250 (1984)[12] (Hoopa Valley).[13]  In the present case, this comprehensive regulatory scheme addresses such subjects as the release of unmarketable live fish and the disposal of unmarketable dead fish, 25 C.F.R. § 242.5; a prohibition on taking certain fish species during spawning season, 25 C.F.R. § 242.6; a seasonal limit on the total volume of fish taken during any individual fishing season, 25 C.F.R. § 242.9; and limitations on, and regulations concerning the use of, fishing equipment, 25 C.F.R. § 242.10.  As in Eberhardt, the specific regulations at issue in the present case allow eligible Indians to take fish from Red Lake for their own use, but place restrictions upon commercial fishing.  Compare 25 C.F.R. §§ 242.2, 242.4 (2012) (Red Lake), with 25 C.F.R. § 250.8(d)-(e) (1984) (Hoopa Valley).  Accordingly, this Court finds that the comprehensive regulatory scheme governing Commercial Fishing on Red Lake Indian Reservation, codified at 25 C.F.R. § 242, is "designed to manage the fishery for the benefit of the Indians, not to extinguish any reserved tribal fishing rights."  See, e.g., Eberhardt, 789 F.2d at 1361.

Although Defendant argues that the specific regulations that he is alleged to have violated infringe his treaty rights, he does not argue that Interior lacked the authority to promulgate the Commercial Fishing on Red Lake Indian Reservation regulations.  Even if he did, this Court is persuaded by the reasoning of the Ninth Circuit's decision in Eberhardt, and by the U.S. Supreme Court's acknowledgement of Interior's authority to issue Indian fishing regulations, that Interior does have the authority to promulgate the regulations at issue in the present case.

---

[11] Hereinafter, all references to 25 C.F.R. § 242, and its subsections, are to the 2013 printing of the Code of Federal Regulations.

[12] Hereinafter, all references to 25 C.F.R. § 250, and its subsections, are to the 1984 printing of the Code of Federal Regulations.

[13] The Court takes judicial notice that regulations concerning Commercial Fishing on Red Lake Indian Reservation have been codified in the Code of Federal Regulations since 1938, and appear to have existed in some form since at least 1930.  See Commercial Fishing on Red Lake Indian Reservation, 25 C.F.R. §§ 291, 291.1 n.† (1938).

See, for comparison, Eberhardt, 789 F.2d at 1350-61 (citing Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. at 691).

Finally, the Ninth Circuit in Eberhardt wrote that, because the regulations in that case had been promulgated pursuant to the Administrative Procedures Act, they "may be set aside [only] if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 789 F.2d at 1362 (citing 5 U.S.C. § 706(2)(A)); see also Sierra Club v. Clinton, 746 F. Supp. 2d 1025, 1031 (D. Minn. 2010) (Frank, J.) ("The Court must affirm an agency decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A); and citing Sierra Club v. Envtl. Prot. Agency, 252 F.3d 943, 947 (8th Cir. 2001); and Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)). Defendant here does not argue that the specific regulations at issue in the present case, much less the comprehensive regulatory scheme for Commercial Fishing on Red Lake Indian Reservation, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

> **c. The District of Minnesota has held that the Federal Government may regulate the exercise of Indian treaty-based usufructuary rights by means of "valid conservation measures" that do not discriminate against Indians.**

The District of Minnesota has twice been presented with the question of whether the Federal Government, by means of properly promulgated agency regulations, may regulate the exercise of usufructuary rights guaranteed by Indian treaties (although neither was in the context of a Lacey Act prosecution). In both instances, involving the same defendant, the court held that the Federal Government could do so.

In United States v. Gotchnik, Nos. 5-94MG-05 and 5-94MG-08 (RLE), 1995 WL 312012 (D. Minn. Mar. 28, 1995) (hereinafter Gotchnik I), defendant David Gotchnik (Mr. Gotchnik)

was charged with possession and use of a snowmobile in the Boundary Waters Canoe Area Wilderness ("BWCAW"), in violation of 36 C.F.R. § 261.16(a).[14]  Mr. Gotchnik, a member of the Bois Forte Tribe of Chippewa Indians, argued the any regulation limiting his ability to hunt in the BWCAW would abrogate his rights to hunt within the ceded territories, guaranteed by the 1854 Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854).  Gotchnik I, 1995 WL 312012, at *5.  The court concluded that the prohibition on the use of snowmobiles in the BWCAW did not "in any meaningful respect[] infringe upon Gotchnik's usufructuary rights that were retained under the 1854 Treaty."  Id. at *6.

Four years later, Mr. Gotchnik was again in front of the District Court.  United States v. Gotchnik, Nos. 98-cr-262, 98-cr-302 (ADM/RLE), 57 F. Supp. 2d 798 (D. Minn. 1999) (hereinafter "Gotchnik II").  This time, he was accused of using a motor-powered canoe in an area of the BWCAW where such motors were prohibited, in violation of 36 C.F.R. § 261(a).  Gotchnik II, 57 F. Supp. 2d at 800.  Again, Mr. Gotchnik argued that the Federal government could not limit the exercise of his usufructuary rights—this time, his right to take fish—within the ceded territory.  Id.  This time, the District Court upheld the regulations as "permissible, nondiscriminatory conservation measure[s]."  Id. at 803.  The District Court found that the U.S. Supreme Court had upheld such regulations when imposed by a state in and had "reaffirmed this principle in its mot recent Indian law decision."  Id. (citing Puyallup Tribe v. Dep't of Game, 391 U.S. 392, 396 (1968) (". . . the manner of fishing, the size of the take, the restriction on commercial fishing, and the like may be regulated by the State in the interest of conservation . . . ."); and Mille Lacs, 526 U.S. at 524 ("We have repeatedly reaffirmed state authority to impose

---

[14] A second, non-Indian, defendant also was charged with a snowmobile violation, but did not assert any treaty-based defense.

reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing and gathering rights in the interest of conservation.")).

The regulations at issue in <u>Gotchnik I</u> and <u>Gotchnik II</u> were enacted pursuant to Congress's express prohibition of the use of motorized vehicles in wilderness areas. <u>See</u> 16 U.S.C. § 1133(c) (generally prohibiting use of motorized vehicles in wilderness areas). However, the lack of any such express authorization in the present case is immaterial, as the Court has already determined that Interior had the authority to enact regulations concerning Commercial Fishing on the Red Lake Indian Reservation. <u>See</u> Part II.B.1.b, <u>supra</u>.

### d. Conclusion.

For the reasons articulated above, the Court finds that Defendant has not met his burden of demonstrating that the regulations are invalid.

### 2. The Lacey Act applies to Indians.

Defendant argues that Congress never intended the Lacey Act to apply to Indians. The Court cannot agree with this argument, which is clearly contrary to binding Eighth Circuit precedent. <u>United States v. Big Eagle</u>, 881 F.2d 539, 540 n.1 (8th Cir. 1989) (hereinafter "<u>Big Eagle II</u>") ("the Lacey Act, by its terms and definitions, applies to Indian people" (citing 16 U.S.C. § 3371(e) ("The term 'person' includes any individual . . . subject to the jurisdiction of the United States")). Furthermore, the Eighth Circuit's holding in <u>Big Eagle II</u> is consistent with the Ninth Circuit's decision in <u>United States v. Sohappy</u>. 770 F.2d 816 (9th Cir. 1985). Upon a review of the Lacey Act's legislative history, the Ninth Circuit held that Congress intended that the act apply to Indians:

> [T]he overall purpose in subjecting persons who traffic in illegally obtained fish to the stiffer Lacey Act penalties was to allow the Federal Government to provide more adequate support for the full range of laws that protect wildlife.

Indians who traffic in illegal wildlife harm the Lacey Act's goal of wildlife preservation just as much as non-Indian traffickers. . . . To exempt Indians from these penalties would impede attainment of Congress' goal.

Id. at 821 (internal quotations, alternations, and citations to Congressional reports omitted).[15]

Defendant offers no authority—in particular, no binding Eighth Circuit or U.S. Supreme Court authority—to suggest that the Lacey Act does not apply to Indians. Therefore, the Court holds, consistent with Big Eagle II, that the Lacey Act does apply to Indians, and, consequently, that the Indictment is not facially improper.

### 3. The Government's prosecution of Defendant under the Lacey Act does not violate his treaty fishing rights.

Having determined that the Lacey Act applies to Indians, the Court next must determine whether the Government's prosecution of Defendant under the Lacey Act is improper as a punishment for the exercise of his right to fish, as guaranteed by treaties.

### a. Standard of Review

"A prosecution designed solely to punish a defendant for exercising a valid legal right violates due process." United States v. Leathers, 354 F.3d 955, 961 (8th Cir. 2004) (citing Blackledge v. Perry, 417 U.S. 21, 25-26 (1974); United States v. Graham, 323 F.3d 603, 606 (8th Cir. 2003)). A defendant may demonstrate that he was prosecuted for an improper motive by either direct or circumstantial evidence. Id. (citing United States v. Beede, 974 F.2d 948, 951 (8th Cir. 1992)). However, "[i]t is the defendant's burden to show that the prosecution was brought in order to punish the defendant for the exercise of a legal right." Id. (citing United States v. Kriens, 270 F.3d 597, 602 (8th Cir. 2001)). The Eighth Circuit has repeatedly described

---

[15] See also United States v. Big Eagle, 684 F. Supp. 241, 244 (D.S.D. 1988) ("The defendant next contends that the Court lacks subject matter jurisdiction to hear this action because the Lacey Act does not apply to Indians. The only United States Court of Appeals to decide this issue has held that the Lacey Act does apply to Indians. This Court is persuaded that the decision of the Ninth Circuit in United States v. Sohappy is correct and that the discussion of the issues raised in Sohappy is dispositive for purposes of deciding this motion" (citations omitted).).

the Defendant's evidentiary burden in proving an improper motive for prosecution as "a heavy one." Id. (citing United States v. Kelley, 152 F.3d 881, 885-86 (8th Cir. 1998)).

**b. Discussion**

The Court begins with the issues that are not in dispute. First, in the present case, neither party disputes that the Chippewa Indians[16] in Minnesota generally have a right to fish on tribal land and within the territory ceded pursuant to the 1837 Treaty. "As a general rule, Indian tribes have 'the power to manage the use of their territory and resources both by members and nonmembers.'" United States v. Big Eagle, 684 F. Supp. 241, 245 (D.S.D. 1988) (hereinafter "Big Eagle I") (citing New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 335 (1983), aff'd Big Eagle II, 881 F.2d 539 (8th Cir. 1989), reh'g denied 1989 U.S. App. LEXIS 13872 (8th Cir. Sept. 8, 1989) (en banc), cert. denied 493 U.S. 1084 (1990). "Although some treaties provide expressly that Indians have exclusive hunting, fishing, and gathering rights on their reservations, it is not necessary that the rights be referred to as "exclusive" in the treaty, or even that they be expressly mentioned. Exclusive on-reservation hunting, fishing, and gathering rights are implied from the establishment of a reservation for the exclusive use of a tribe, whether the reservation was set aside by executive order, statute, agreement, or treaty." 1-18 Cohen's Handbook of Federal Indian Law § 18.03 (footnotes omitted). "Such treaty rights can be asserted by . . . an individual member of the Tribe." United States v. Dion, 476 U.S. 734, 738 n.4 (1986).

Additionally, in the present case neither party disputes that the Lacey Act is a Federal statute of general applicability. Both Defendant and the Government acknowledge that "'federal laws of general applicability 'are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question.'" United States v. Wadena, 152 F.3d 831, 846 (8th Cir. 1998) (quoting Sohappy, 770 F.2d at 819 (9th Cir.

---

[16] Also known as Ojibwe or Anishinabe.

1985) (quoting, in turn, United States v. Burns, 529 F.2d 114, 117 (9th Cir. 1975))).  If a court

determines that there is a treaty right that exempts Indians from the operation of a Federal statute

of general applicability, the court next asks whether that treaty right was abrogated by Congress.

A court generally will find that Congress has abrogated a treaty right only where there is explicit

statutory language doing so.  Dion, 476 U.S. at 738-39 (collecting cases).

    The first question, then, is not, as Defendant urges, whether the Lacey Act abrogates his

treaty right to take fish on the Red Lake Indian Reservation—a right that the Government

acknowledges Defendant has.  Rather, the Court must begin with this question: Does

Defendant's treaty right exempt him from the operation of the Lacey Act.

      **i.**  **The case law, both in the Eighth Circuit and elsewhere, supports the Government's assertion that Defendant's treaty right to fish does not exempt him from operation of the Lacey Act.**

      **(a) <u>Sohappy</u> and <u>Stone</u>**

    The Ninth Circuit, in Sohappy, was the first court to address this question in detail, and it

found that the defendants' treaty rights *did not* exempt them from the operation of the Lacey Act.

770 F.2d at 820.  The defendants in Sohappy were convicted of violating the Lacey Act by

catching and selling fish in violation of tribal and state law.  Id. at 817.  They appealed, arguing

"that federal prosecution of Indians for violations of tribal fishing law violates Indian

sovereignty and Indian treaty reserved fishing rights."  Id.

    The Ninth Circuit rejected those arguments.  With regard to the argument that a Lacey

Act prosecution would violate Indian tribal sovereignty, the court held that "Indian sovereignty is

necessarily limited and must not conflict with the overriding sovereignty of the United States."

Id. at 819 (internal citation and quotation omitted).  Additionally, the court held that a Lacey Act

prosecution does not impair Indian tribal sovereignty, but rather "supports tribal laws by

authorizing federal penalties for violations." Id. at 819-20.[17] Furthermore, it held that a Lacey Act prosecution does not violate reserved fishing rights because "the Indians do *not* have any treaty reserved right to exercise *exclusive* jurisdiction over such fishing matters. Nor is there "specific language [in the treaties] . . . 'purporting to exempt Indians from the laws of general applicability throughout the United States.'" Id. at 820 (quoting Burns, 529 F.2d at 117 (emphasis and alterations in Sohappy).

The Eighth Circuit expressly adopted this reasoning, albeit not in a Lacey Act case, in United States v. Stone. 112 F.3d 971 (8th Cir. 1997). In Stone, the defendant, an enrolled member of the White Earth Band of Chippewa Indians, was convicted of violating the Airborne Hunting Act[18] on the White Earth Indian Reservation. 112 F.3d at 972. He appealed, arguing in part that "the treaties between the Chippewa Indians and the United States vested the tribes with jurisdiction over hunting, fishing and wild rice gathering and that therefore he cannot be federally prosecuted for hunting on the reservation." Id. at 973. The Eighth Circuit, citing Sohappy with approval, rejected this argument:

> As the Ninth Circuit pointed out, however, despite the fishing rights contained in a treaty, "Indians do not have any treaty reserved right to exercise exclusive jurisdiction over such fishing matters." United States v. Sohappy, 770 F.2d 816, 820 (9th Cir. 1985) (upholding federal jurisdiction over an Indian on the reservation under federal statute criminalizing transporting, selling, or acquiring fish). "Indian sovereignty is 'necessarily limited' and must not conflict with the overriding sovereignty of the United States." Id. at 819. Federal laws of general applicability "are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question." Burns, 529 F.2d at 117; Sohappy, 770 F.2d at 820 (quoting Burns, 529 F.2d at 117). . . . [A]s in Sohappy, federal jurisdiction under the Airborne Hunting Act is not "disruptive of tribal authority, for rather than overturning basic tribal regulations, it supports the tribal laws by authorizing federal penalties for

---

[17] Although the predicate offenses to the Lacey Act prosecution in Sohappy were violations of tribal and state wildlife regulations, 770 F.2d at 817, the Ninth Circuit later held that validly enacted Federal regulations concerning wildlife conservation in Indian country also form a legitimate basis for a Lacey Act prosecution. See United States v. Eberhardt, 789 F.2d 1354, 1359-60 (9th Cir. 1986).

[18] 16 U.S.C. § 742j-l.

violations," and its enforcement against an Indian on Indian land is proper.  Id. at 819-20.

Stone, 112 F.3d at 973-74.

Defendant argues that neither Sohappy nor Stone controls the present case.  First, Defendant argues that Sohappy is inapplicable, because the treaty at issue in that case provided for a tribal "right to take fish at all 'usual and accustomed places' [which] was not exclusive but was to be shared 'in common with the citizens of the Territory.'"  770 F.2d at 819.  In contrast, Defendant argues that the Chippewa Indians retain exclusive fishing rights on their reservations.  The Defendant misses the point.  The issue described by the court in Sohappy was whether the treaty reserved exclusivity as to "*jurisdiction over enforcement* of tribal fishing law against Indians."  770 F.2d at 818.  Defendant has provided no evidence of any treaty language, or any other authority, that reserves to the Chippewa Indians exclusive jurisdiction—to the exclusion of the United States—over enforcement of on-reservation fishing regulations.

Defendant also argues Stone is inapplicable because it did not concern fishing rights.  The Court is not persuaded.  Although Stone was prosecuted for a hunting violation and not a fishing violation, the defendant's argument in that case was substantially the same as the Defendant's argument in the present case: that his Federal prosecution violated the usufructuary rights he was guaranteed by one or more treaties.  Defendant offers no reason, and the Court can think of none, why the distinction between hunting and fishing should be material.

### (b) **Big Eagle I** and **II**.

Three years after the Ninth Circuit decided Sohappy, the U.S. District Court for the District of South Dakota denied a motion to dismiss that raised substantially the same questions at issue in the present case.  In Big Eagle I, the defendant was an enrolled member of the Crow Creek Sioux Tribe, and was charged with a Lacey Act violation, the predicate offense being a

violation of the fishing regulations contained in the Lower Brule Sioux Tribe's Wildlife Management Code. 684 F. Supp. at 242-43. The defendant argued that the Fort Laramie Treaty of 1868, 15 Stat. 635 (Apr. 29, 1968), guaranteed him a right to fish where he did. 684 F. Supp. at 244. The court concluded that the exercise of such a right could be regulated either by lawfully enacted tribal regulation, or by its explicit abrogation under Federal law. Id. at 246 ("Neither the Lacey Act nor the Lower Brule Wildlife Management Code 'takes away the rights of Indians to fish in the Missouri River,' as the defendant argues. Rather, Indians retain the right to fish in accordance with tribal regulations except as these rights may be expressly abrogated by federal law.").

Upon a review of various Sioux treaties, the Big Eagle I Court concluded that those treaties "may be construed to authorize regulation of fishing by the Indians within each reservation," and that various Sioux tribes (including the Lower Brule) had enacted "their own fishing regulations. Id. at 245. Because the Lower Brule Sioux Tribe had enacted regulations governing the exercise of treaty rights within the Lower Brule Reservation, and because those regulations governed the defendant's actions, and because the defendant's violation of those regulations precipitated his prosecution under the Lacey Act, that prosecution did not constitute a *Federal* abrogation of his treaty rights. Id. at 244-46.[19]

### (c) **Eberhardt** and **Gotchnik I** and **II.**

As articulated in Part II.A.1, supra, the Ninth Circuit in Eberhardt, 789 F.2d 1354, held that Federal regulation of on-reservation fishing pursuant to the Department of Interior's responsibility to manage tribal resources does not abrogate the tribe's treaty fishing rights. Cf. Mille Lacs, 526 U.S. at 204 ("this Court's cases have also recognized that Indian treaty-based

---

[19] Although the Eighth Circuit did not specifically address this argument in Big Eagle II, it did affirm the District Court's denial of the defendant's motion to dismiss.

usufructuary rights do not guarantee the Indians 'absolute freedom' from state regulation" (citation omitted)); accord Gotchnik I, 1995 WL 312012, and Gotchnik II, 57 F. Supp. 2d 798.

### (d) Defendant presents no case law in which a court has held that an Indian's treaty rights exempt him from operation of the Lacey Act.

Defendant presents no authority, and this Court has found none, holding that an Indian's treaty rights exempt him from operation of the Lacey Act. Instead, Defendant relies on cases that only generally address tribal usufructuary rights and cases holding that certain Federal prosecutions under acts other than the Lacey Act abrogated Indian treaty rights.

Defendant does not specifically address the rationale of Big Eagle I, but instead argues that Sohappy, Stone, and Big Eagle (presumably both I and II) were effectively reversed by the U.S. Supreme Court's decision in Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172 (1999). However, Mille Lacs has no bearing on the present case, for two reasons: First, Mille Lacs did not, as Defendant suggests, expand the Indians' *on-reservation* usufructuary rights that were addressed in Stone, but instead confirmed that the Chippewa Indians reserved rights to hunt, fish, and gather *off-reservation* in the "ceded territory." 526 U.S. at 204. Defendant is charged with an on-reservation offense.[20] Thus, Mille Lacs does not apply.

Second, Mille Lacs held that treaties limited the *State's* authority to infringe Chippewa Indians' usufructuary rights—it says nothing about the *Federal Government's* authority to prosecute pursuant to a law of general applicability:

> [T]he 1837 Treaty gave the Chippewa the right to hunt, fish, and gather in the ceded territory *free of territorial, and later state, regulation*, a privilege that others did not enjoy. Today, *this freedom from state regulation curtails the State's ability to regulate hunting, fishing, and gathering by the Chippewa in the ceded lands.*

---

[20] The Indictment alleges that Defendant violated 25 C.F.R. §§ 242.2 and 242.4, which govern "on the Red Lake Indian Reservation."

Id. (emphasis added). "The federal government can regulate fishing concurrently with the Indian tribes in the interest of conservation." Big Eagle, 684 F. Supp. at 244 (citing Sohappy, 770 F. Supp. at 819); see also Stone, 112 F.3d at 973-74.

Defendant also urges the Court to follow United States v. White, 508 F.2d 453 (8th Cir. 1974). In White, the defendant, a member of the Red Lake Band of Chippewa Indians, was seen shooting a bald eagle on the Red Lake Indian Reservation, and was charged with unlawful taking under the Bald and Golden Eagle Protection Act (the "BGEPA"), 16 U.S.C. § 668(a). White, 508 F.2d at 454. The District Court dismissed on the grounds that the defendant was legally exercising his treaty guaranteed right to hunt on the reservation, and the Eighth Circuit affirmed on the same grounds. Id. at 454, 457. In particular, the Eighth Circuit held that Congress, in enacting the BGEPA, had not explicitly abrogated Indian treaty rights to hunt eagles and, therefore, that Defendant was legally exercising his hunting right.

However, prosecution under the BGEPA, unlike the Lacey Act, is not premised upon a predicate violation of a Federal regulation concerning wildlife protection in Indian country. Thus, in White the court was presented only with the question of whether the BGEPA abrogated the defendant's treaty right.

In the present case, the Court need not reach the question of whether Defendant's treaty right to fish was abrogated by the Lacey Act, because the Court finds that the the Federal regulations governing fishing on Red Lake legitimately limit the scope of this right, such that Defendant's right to fish does not excuse him from the operation of the Lacey Act. See Wadena, 152 F.3d at 846 (Federal statute of general applicability applies to Indians unless treaty right *excuses them from operation of the statute*, or the right has been explicitly abrogated).

### ii. Summary

The validity of the federal regulations that govern fishing on the Red Lake Indian Reservation "depends on whether Congress has given Interior express or implied statutory authority to regulate Indian fishing." Eberhardt, 789 F.2d at 1359. The regulations codified at 25 C.F.R. § 242, which Defendant is alleged to have violated, are part of a comprehensive regulatory scheme governing Commercial Fishing on Red Lake Indian Reservation. Such regulations "promulgated by Interior pursuant to its responsibilities as trustee to preserve and protect Indian resources" are within Interior's statutory authority under 25 U.S.C. §§ 2 and 9. Eberhardt, 789 F.2d at 1359-60. Additionally, both the Eighth and Ninth Circuits have upheld Lacey Act prosecutions against treaty-rights defenses, and Defendant's attempts to distinguish Sohappy, Stone, and Big Eagle are unavailing. Therefore, applying the reasoning in those cases, the Court finds that although Defendant generally has a right to fish guaranteed by the various Chippewa Indian treaties, that right is (1) subject to lawful regulation by the Federal Government, and (2) the Federal regulations that form the predicate offense for Defendant's Lacey Act prosecution are valid regulations.

Accordingly, Defendant's treaty right does not exempt him from the operation of the Lacey Act and its incorporation of Federal regulations. Because Defendant's treaty right does not exempt him from the operation of the Lacey Act, a Federal statute of general applicability, the Court need not determine whether Congress explicitly abrogated that treaty right. See Wadena, 152 F.3d at 846.

While "[a] prosecution designed solely to punish a defendant for exercising a valid legal right violates due process," Leathers, 354 F.3d at 961, in the present case, Defendant has not met his burden of showing that the right he asserts—his treaty-based right to fish on the Red Lake

Indian Reservation—exempts him from the operation of the Lacey Act. Consequently, the Court recommends that Defendant's Motion to Dismiss, [Docket No. 67], be **DENIED**.

**B. Defendant's Motion to Dismiss Indictment due to Selective Prosecution, or for Additional Discovery [Docket No. 71]**

Defendant Holthusen alleges that he is a victim of selective prosecution and moves for dismissal, or, in the alternative, for additional discovery into the alleged selective prosecution. (See Docket No. 71).

**1. Standard of Review**

"In order to make a prima facie case of selective prosecution, [a defendant] must show: (1) people similarly situated to him were not prosecuted; and (2) the decision to prosecute was motivated by a discriminatory purpose." United States v. Hirsch, 360 F.3d 860, 864 (8th Cir. 2004) (citing United States v. Perry, 152 F.3d 900, 903 (8th Cir. 1998)). The defendant "has the burden of proving the government engaged in selective prosecution." Id. (citing United States v. Kelley, 152 F.3d 881, 885 (8th Cir. 1998)). "The 'evidentiary burden is a heavy one.'" United States v. Peterson, 652 F.3d 979, 981 (8th Cir. 2011) (quoting United States v. Leathers, 354 F.3d 955, 961-62 (8th Cir. 2004)).

A defendant seeking discovery regarding his selection prosecution claim "must present some evidence that tends to show the existence of both elements." United States v. Perry, 152 F.3d 900, 903 (8th Cir. 1998) (citing United States v. Armstrong, 517 U.S. 456, 468-69 (1996)). "The justifications for a rigorous standard for the elements of a selective prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such claim." Armstrong, 517 U.S. at 468; see also United States v. Venable, 666 F.3d 893, 900 (4th Cir. 2012) ("Because discovery imposes high costs on the government, the standard for obtaining discovery in support of a selective prosecution claim is only slightly lower than for a dismissal of the indictment;

rather than presenting clear evidence, the 'defendant must produce 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent" (quoting <u>United States v. Olvis</u>, 97 F.3d 739, 743 (4th Cir. 1996) (quoting, in turn, <u>Armstrong</u>, 517 U.S. at 470))).

### 2. Facts

Defendant was indicted as part of "Operation Squarehook," a collaborative effort among officials of the Federal Government, the Leech Lake Band of Chippewa Indians, the Red Lake Band of Chippewa Indians, and the State of Minnesota to investigate and prosecute illegal poaching and marketing of protected fish on the Leech Lake and Red Lake Reservations and in Beltrami, Cass, Clearwater, Itasca, Pennington, and Polk Counties. (Def.'s Ex 1, at 1-3).[21]

Defendant Holthusen is one of ten persons who were indicted in four separate Federal cases. In each of these Federal prosecutions, the government has alleged violations sufficient to invoke criminal penalties, subjecting the Defendants to a potential fine of up to $20,000.00, and/or a potential prison sentence of up to five years. Of the ten individuals charged in these separate Federal prosecutions, four are identified in the various indictments as Indians and three others self-identify as Indians in various pleadings.[22]

Defendant proffers that State prosecutors in six counties have charged a total of twenty-one persons with various misdemeanor and gross misdemeanor charges. (Def.'s Ex. at 1). Defendants in the State prosecutions are subject to a possible fine of not less than $3,000.00 and not more than $10,000, and/or a potential jail sentence of not less than ninety days and not more

---

[21] Defendant's Exhibit 1consists of the following:
- **At 1**: Minnesota Dep't Natural Res., Operation Squarehook – State charges by county (undated).
- **At 2-4**: Press Release, U.S. Attorney's Office, District of Minnesota, Ten Indicted In Connection With Illegal Poaching of Walleye On Leech Lake And Red Lake (April 10, 2013).
- **At 5-7**: Minnesota Dep't of Natural Resources, "Operation Squarehook: Investigation of illegal sales of game fish results in more charges," <u>Brainerd Dispatch</u>, April 15, 2013 (printed from internet).
- **At 8-10**: Bill Hudson, "31 charged As DNR Nets Walleye Poaching Ring," WCCO, April 15, 2013 (printed from internet).

[22] For the information in this paragraph, <u>see</u> fn.3, <u>supra</u>.

than one year.  See Minn. Stat. §§ 97A.301, 97A.325.  There is no evidence in the record offered by the movant identifying any of the defendants in the State prosecutions, stating one way or the other definitively whether any of them are Indian, or suggesting that the factual circumstances in the State prosecutions are substantially identical to those of the present case.

### 3.  Discussion

In moving to dismiss on the basis of an allegation of selective prosecution, Defendant has the burden of proving both that persons similarly situated to him were not prosecuted, and that the prosecution decisions were made with a discriminatory purpose or intent.  Hirsch, 360 F.3d at 864.  Because, on the present record, Defendant has shown no evidence of either necessary factor in order to meet his initial burden, he has failed to demonstrate that he is entitled to dismissal of the Indictment or that he should be entitled to any additional discovery on the subject.

#### a.  Defendant has not shown that he was treated differently from similarly situated persons.

First, Defendant has failed to identify any similarly situated persons who were **not** prosecuted.  "Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  Venable, 666 F.3d at 900-01 (citing Olvis, 97 F.3d at 744).  Defendant appears to argue solely and conclusorily that the twenty-one persons subject to the State prosecutions are similarly situated to him.  Presumably Defendant contends that the State defendants are similarly situated on the sole basis that they may have been identified in the same Operation Squarehook investigation.[23]  But there is little, if any, evidence in the present record

---

[23] The precise contours of Defendant's argument are not entirely clear, because he does not identify the *specific* persons he believes are similarly situated to himself.  Defendant appears to argue that the twenty-one persons prosecuted by the State are the similarly situated persons; thus, he does not argue that the similarly situated persons were *not prosecuted*, but, rather, argues that those persons were *prosecuted by the State and not the Federal government*, and, as a result, were subjected to potentially lesser penalties than he.

that those persons are, in fact, similarly situated to Defendant.  For example, the Lacey Act makes it illegal "to import, export, transport, sell, receive, acquire, or purchase any fish . . . taken, possessed, transported, or sold *in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law*."  16 U.S.C. § 3372(a)(1) (emphasis added).  Defendant has not demonstrated that any of the subjects of the State prosecutions—or any other person he conclusorily asserts may be similarly situated to himself—violated any Federal or Tribal law or regulation, as opposed to violating only State law.

In fact, for a Federal prosecutor deciding whether to prosecute two persons, the mere fact that a state authority has elected to prosecute one of them may be a "legitimate prosecutorial factor" serving to distinguish the two.  Id. at 901.

Because Defendant has failed to meet his threshold burden to show clear evidence, much less any credible evidence, to demonstrate that he was treated differently from other similarly situated persons—or even that there *are* any persons similarly situated to Defendant for purposes of the present case—he has failed to show selective prosecution.

> **b.  Even if Defendant had identified similarly situated persons <u>and</u> shown that he was treated differently from them, he nevertheless has failed to demonstrate that any such differentiation was the result of a discriminatory improper motive.**

Defendant argues that he and other Indians were subjected to Federal prosecution, while non-Indians were instead subjected only to State prosecution.  (See Mot. Dismiss Selective Prosecution [Docket No. 71]).  He alleges that this alone is evidence of a racially discriminatory motive in the federal charging decisions.  (Id.).  However, in addition to his previously addressed failure to demonstrate even some credible evidence that the defendants in the State prosecutions actually *are* similarly situated to him,[24] Defendant also fails to demonstrate any evidence in the

---

[24] See Part II.B.3.a, supra.

record to show beyond mere allegation that any charging differentiation is the result of improper motive.

Defendant appears to start from the flawed premise that any distinction in the prosecutions of Indian tribal members and non-Indians is necessarily per se an impermissible "racial" distinction. In fact, the federal courts have repeatedly held that treating Indian tribal members differently from non-Indians for incidents arising in Indian country does not violate either due process or equal protection. See, e.g., United States v. Antelope, 430 U.S. 641, 646-47 (1977) (holding that "respondents were not subjected to federal criminal jurisdiction because they are of the Indian race but because they are enrolled members of the Coeur d'Alene Tribe. We therefore conclude that the federal criminal statutes enforced here are based neither in whole nor in part upon impermissible racial classifications."); Fisher v. District Court, 424 U.S. 382, 390 (1976) (in civil case, "we reject the argument that denying [the Indian plaintiffs] access to the Montana courts constitutes impermissible racial discrimination. The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-sovereign status of the Northern Cheyenne Tribe under federal law."); United States v. Aanerud, 893 F.2d 956, 960 (8th Cir. 1990) (upholding prosecution of non-Indians for harvesting leeches on the White Earth Reservation against selective prosecution challenge because "members of the White Earth Band and non-members are simply not similarly situated with regard to their respective rights to trap leeches within the confines of the Reservation.")

Defendant also fails to prove that there is any "racial" distinction between himself and the other Indian tribal member Defendants in the four separate Federal prosecutions, on the one hand, and the subjects of the State prosecution on the other hand. Defendant offers only a news report that states that "[t]en members of the Red Lake and Leech Lake bands are charged in

Federal Court," while "another 21 non-tribal buyers and sellers are now facing state charges." (Def.'s Ex. at 9).[25]  The superficial, perfunctory news article representation of the "racial" make-up of the Defendants in the Federal prosecutions compared to the State prosecutions on which Defendant relies is at odds with the evidence in the record which shows only seven of the ten Federal defendants in the four separate Federal prosecutions are identified as Indian.  See fn. 3, supra.  If the news report upon which Defendant relies does not even accurately reflect whether all, or only some, of the Defendants in the four separate Federal prosecutions are Indian, then the same article cannot be a credible source of evidence as to accurately reflect whether all, or only some, of the subjects of the State prosecutions are non-Indian.  Defendant has the burden of proving selective prosecution, and he might have examined the actual case files of the defendants in the State prosecutions to ascertain whether there is evidence to demonstrate their racial makeup.  However, Defendant has not done so on the present record.

Finally, even assuming, *arguendo*, that Defendant had demonstrated that there was a clear racial distinction between himself and other Defendants in the Federal prosecutions, and those persons subject to the State prosecutions, "'[t]o establish discriminatory effect in a race case, the claimant must show people of another race violated the law and the law was not enforced against them.'"  See United States v. Hare, 308 F. Supp. 2d 955, 991 (D. Neb. 2004) (with regard to selective enforcement defense) (quoting United States v. Bell, 86 F.3d 820, 823 (8th Cir. 1996)).  Defendant has not even demonstrated that any of the subjects of the State prosecutions violated the Lacey Act and were not prosecuted in Federal court, and, therefore, Defendant has failed to demonstrate any actual discriminatory effect on the present record.

---

[25] See also Def.'s Ex. 1, at 6 (describing Defendants in the federal prosecutions as "10 tribal members").
    Defendant states that "at least eight of the ten federal defendants are Native American, and are enrolled members of an Indian tribe in the state of Minnesota."  (Mot. Dismiss Selective Prosecution [Docket No. 71] at 1).  Defendant does not account for the discrepancy between his count of eight Indian defendants, and the seven who are identified as Indian in the record.

Because Defendant Holthusen has failed to show either of the two material elements

necessary to dismiss an indictment on the basis of selective prosecution, the Court recommends

that his Motion to Dismiss Indictment due to Selective Prosecution, or for Additional Discovery,

[Docket No. 71], be **DENIED**.


### III. DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS [Docket No. 57]

Defendant Holthusen argues that he was in custody when he was interviewed by law

enforcement on July 24, 2011, and that his statements made during that interview must,

therefore, be suppressed because he was not advised of his <u>Miranda</u> rights.[26]  (Def.'s Mem.

Supp. Mot. Suppress Statements [Docket No. 87], at 5-9).  Specifically with regard to the written

affidavit that Defendant signed, he argues (1) that because he was in custody and not

Mirandized, it should be suppressed as "fruit of the poisonous tree"; and (2) that his signature on

the affidavit was not voluntary.  (<u>Id.</u> at 9-11).

#### A. Facts[27]

On July 24, 2011, at approximately 4:30 p.m., two special agents from the U.S. Fish and

Wildlife Service ("USFWS"), Special Agent Craig Tabor ("SA Tabor") and Special Agent

Ronald Lee Armstrong ("SA Armstrong") (together, the "interviewing agents"), interviewed

Defendant Holthusen on the Red Lake Indian Reservation.  The recording begins shortly before

the interviewing agents arrived at the wrong residence, and continued as they proceeded to the

---

[26] <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)

[27] The facts in this Part are derived from: (1) the testimony of U.S. Fish and Wildlife Service ("USFWS") Special Agent Ronald Lee Armstrong ("SA Armstrong") at the July 2, 2013, motions and evidentiary hearing; (2) the testimony of Defendant at the July 2, 2013, motions and evidentiary hearing; (3) **Government's Exhibit 1**: a recording of the interview that SA Armstrong and USFWS Special Agent Craig Tabor conducted with Defendant on July 24, 2011, which the Government offered, and the Court accepted into evidence, for the purposes of this motion; and (4) **Government's Exhibit 2**: an affidavit drafted by SA Armstrong and initialed by Defendant, which the Government offered, and the Court accepted into evidence, for the purposes of this motion.

residence of Defendant's girlfriend, Dawn Rosebear, where, at approximately 10 minutes into the record, they found Defendant sitting on the porch. A total of four other Federal, Tribal, and State law enforcement officers arrived at the Rosebear residence in three other vehicles;[28] however, those additional officers remained at the end of the driveway, far away (approximately 25 to 30 yards) from the residence, while the interviewing agents proceeded to interview Defendant on the porch of Rosebear residence.

The interviewing agents introduced themselves, and said that they would like to talk with Defendant on the porch.[29] Defendant responded: "Cool with me." The interviewing agents explained that they were there to talk about "illegal fishing for walleye and selling fish." Defendant responded: "I know, I know what you're talking about. I heard through the grapevine." Approximately 12 minutes into the recording (2 minutes into the interview), the interviewing agents stated: "We're not here to arrest you, we're just here to talk to you." Defendant responded: "I know." The interviewing agents then explain the nature of the investigation and state that Defendant's name had come up in the investigation.

Approximately 20 minutes into the recording (10 minutes into the interview), the following exchange takes place between Defendant and SA Tabor:

**Defendant**:  So what's gonna happen, then?

**SA Tabor**:  Well, we don't know yet Brian. I mean, to some extent that, you know, that, that kind of depends on you. You probably have some idea how this works, I mean, uh, the more, the more you help us out, the more you help yourself.

**Defendant**:  Yeah.

**SA Tabor**:  Um, I know it's an uncomfortable position that we're putting you in right now, but, uh, it is what it is, you know.

---

[28] At the July 2, 2013, motions and evidentiary hearing, SA Anderson explained the number of officers was felt reasonable for safety reasons because the agents knew that Defendant had a criminal history.

[29] Defendant said that his girlfriend and her two children were also at the residence.

| **Defendant**: | No, it's—yeah, I know.  Yeah.  I don't like to snitch on anybody else, either, you know, or whatever, that. You know what I mean. |
|---|---|
| **SA Tabor**: | I respect that.  I respect that, I do. |
| **Defendant**: | You know. |
| **SA Tabor**: | Um, you know.  Do you have any kids? |
| **Defendant**: | Yeah. |
| **SA Tabor**: | Um, and you know, you have a girlfriend.  There's people in your life that, uh, you know, you want to take care of?  (Sigh.)  Well, you know, sometimes we gotta make tough decisions, and, and sometimes you gotta make a decision where, you know, you just gotta do what's right for yourself and the people you care about. |

After this exchange, Defendant provides the interviewing agents with a phone number to reach him.

The interview continued, with the interviewing agents asking about where Defendant sold fish and how much money he made selling fish.  Approximately 27 minutes, 50 seconds into the recording (17 minutes, 50 seconds into the interview), the following brief exchange took place:

| **Defendant**: | You guys kinda freaked me out there.  I didn't know what was going on. |
|---|---|
| **SA Tabor**: | Oh, all the trucks rolling in? |
| **Defendant**: | Yeah. |
| **SA Tabor**: | Yeah.  Well, it probably would me, too. |

SA Anderson testified that Defendant appeared "very calm" during this exchange, and throughout the course of the interview.  After that exchange, the interview again returned to Defendant's fishing habits and fish sales.

Approximately 41 minutes into the recording (31 minutes into the interview), SA Tabor asked Defendant if he would be willing to sign a written statement concerning the things they

had discussed. Defendant made a brief, unintelligible response, and SA Anderson said that he had some additional questions that he wanted to ask. The interview continued, and about 4 minutes later, about 45 minutes into the recording (35 minutes into the interview), Defendant asked what the interviewing agents wanted him to sign. SA Tabor said he would get back to that, but that he had more questions he wanted to ask first. Approximately 49 minutes into the recording (39 minutes into the interview), SA Tabor explained that he would write out a statement, and that Defendant could review the statement and sign it if he agreed with what was in it. While SA Tabor wrote out the statement, Defendant went inside the residence, unescorted by any officer, to smoke a cigarette.

Approximately 1 hour, 1 minute into the recording (51 minutes into the interview), SA Tabor asked SA Anderson to review the affidavit that SA Tabor had drafted, and the following exchange took place:

**Defendant**: What's gonna to happen with this when we're all done?

**SA Tabor**: I'd really like to be able to give you a, a definite answer, to give, give you some peace of mind right now. Uh, I appreciate how you're, how you're handling yourself here today. Uh . . .

**Defendant**: I was a little freaked out, but I . . .

**SA Tabor**: Well, I don't blame you. I would be, too. Um, I, I can tell you this much—um, the people who make those decisions are gonna to be reading our reports, and asking us questions, and what we will tell them is that we came to your house here today unannounced, and that you met us and were cooperative, and that as far as we know—I mean, unless something else comes up that, you know, that indicates that you've told us some lies, that uh, we're gonna, we're gonna say, you know, that you seemed pretty danged truthful with us.

**Defendant**: I have been totally honest.

**SA Tabor**: Well, I'm inclined to believe you.

Approximately 1 hour, 5 minutes into the recording (55 minutes into the interview), SA Tabor showed the affidavit that he had drafted to Defendant, and asked if Defendant wished to add anything. Defendant said, "No. Pretty much says it all." SA Tabor then instructed Defendant where to initial and sign the affidavit, and Defendant did so.

The interviewing agents then explained that it would be some time before officials determined what would happen next. Defendant said he would simply have to "man up and deal with it." SA Tabor said again that he would not arrest Defendant, and the interviewing agents left. Defendant was not arrested at the end of the interview.

In total, the recording runs approximately 1 hour, 17 minutes (the interview lasted approximately 1 hour, 7 minutes).[30]

SA Anderson testified at the July 2, 2013, motions and evidentiary hearing that he was wearing a bullet-proof vest beneath plain clothes, and that he was armed but did not think his weapon was visible. He also testified that SA Tabor was dressed similarly, and that the interviewing agents never drew their weapons or acted in any way to restrict Defendant's movements. SA Anderson described the interview as "cordial," and said that Defendant seemed calm and answered the interviewing agents' questions. He testified that the interviewing agents shook Defendant's hand, but did not otherwise place their hands on him to direct or limit his movement.

Defendant testified at the July 2, 2013, motions and evidentiary hearing that he felt he was "intimidated" and "coerced" into speaking with the interviewing agents and signing the affidavit on July 24, 2011. Defendant testified that when the officers arrived he was alarmed to see "all the dust. . . . I seen five vehicles swarming the driveway. It was hot, it was dusty, and

---

[30] As previously noted, the recording begins approximately 10 minutes before the interviewing agents locate and begin to interview Defendant.

they come in fast."  He testified that he had heard about the investigation and that he expected to be questioned at some point, but "not that way—not like that."  Defendant testified that he recognized one vehicle as a Tribal game warden's truck, but did not recognize the other vehicles, and that he was "scared.  I thought I—I was shook up.  I didn't know what was happening." Defendant testified that he saw the officers' badges, and that he believed that all of the officers were armed, but he did not testify that he actually saw any weapons.[31]  Defendant testified that at least one officer who remained with the vehicles stood outside his vehicle watching the residence.  Defendant did not dispute that the interviewing agents told him that he would not be arrested, but testified that: "I don't believe a word they say, though."

## B.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney."  United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). However, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question."  Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody."  Id.

The Eighth Circuit considers six (6) factors when determining whether a suspect is in

---

[31] Defendant testified that it appeared that that officer may have had some sort of long gun, but that he could not be sure.

custody:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Sanchez, 676 F.3d 627, 630 (8th Cir. 2012) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). Those factors, however, are not exclusive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview.'" Sanchez, 676 F.3d at 630-31 (quoting United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011)).

The ultimate determination is based on the totality of the circumstances, with none of the above factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor. Griffin, 922 F.2d at 1347. The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322. "In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. LeBrun, 363 F.3d 715,

720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v. United States, 543 U.S. 1145 (2005)).  The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody."  Axsom, 289 F.3d at 500 (internal quotation marks omitted).

### C. Discussion

#### 1. Defendant's oral statements

Based on the present record in this case, the totality of the circumstances indicates that Defendant was not in custody when he was interviewed by SA Tabor and SA Anderson on the porch of the Dawn Rosebear residence on July 24, 2011.  Therefore, the interviewing officers were not required to provide the Defendant with a rights warning consistent with Miranda.

The interviewing agents advised Defendant early in the interview that they were not going to arrest him.  Thus, the first factor mitigates against a finding of custody.  Defendant's testimony as to his subjective belief that he might be arrested, simply because he did not believe the interviewing agents when they told him that he would not be arrested, is immaterial because "[o]ur focus during this inquiry is on 'objective circumstances, not on subjective views of the participants.'"  United States v. Muhlenbruch, 634 F.3d 987, 996 (8th Cir. 2011) (quoting United States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007)); see also United States v. Mehilove, No. 11-cr-219 (SRN/SER), 2011 U.S. Dist. LEXIS 121247, at *8 (D. Minn. Sept. 15, 2011) (Rau, M.J.) ("The 'determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned'" (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).), adopted by 2011 U.S. Dist. LEXIS 117583 (D. Minn. Oct. 12, 2011).

However, because the interviewing officers never expressly told Defendant that he could terminate questioning or that he was free to leave, this first factor moves the needle only slightly. "The first Griffin factor weighs heavily in favor of noncustody when the officers clearly inform a suspect that [he] is free to leave or decline questioning. However, when officers inform a suspect only that [he] is not under arrest, the first factor is less determinative in favor of noncustody, and our analysis relies more on the other indicia of custody." Sanchez, 676 F.3d at 631 (citations omitted); see also United States v. Ollie, 422 F.3d 1135, 1138 (8th Cir. 2008) (telling defendant that he is not under arrest without advising him that he may termination questioning, "while falling short of an ideal, do[es] weigh against a determination that he was in custody").

The second factor also mitigates against a finding of custody in this case, as there is no evidence that the officers denied Defendant "unrestrained freedom of movement." Defendant again argues that he subjectively did not believe that he was free to leave. (Def.'s Mem. Supp. Mot. Suppress Statements [Docket No. 87], at 7). As previously articulated, the Court's focus is not on Defendant's subjective beliefs, but is instead on an objective consideration of the facts in the record. SA Anderson testified, and the recording demonstrates, that the interviewing agents did not impair Defendant's freedom of movement, and that, in fact, they allowed him to go inside the residence unescorted for a cigarette break. The totality of the circumstances is sufficient to support a finding that the interviewing agents did not restrain Defendant's freedom of movement.

As to the third factor, as the record demonstrates, although the interview was instigated by law enforcement, Defendant voluntarily acquiesced to participating in the questioning. When the interviewing agents introduced themselves and told Defendant that they wanted to talk with

him, he responded: "Cool with me." Defendant was friendly and cooperative, describing in great detail his fishing activities and fish sales, and never sought to terminate the interview. The Defendant's "decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest." See, e.g., United States v. Czichray, 378 F.3d 822, 829 (8th Cir. 2004) (citing Yarborough v. Alvarado, 541 U.S. 652, 655-59, 663-66 (2004) (where police initiated two-hour interview of suspect in police station, did not tell suspect he was free to leave, and engaged in "pretty friendly conversation" during interview, state court was clearly 'reasonable" in concluding that suspect was not in custody)); Axsom, 289 F.3d at 502 (defendant was "extremely friendly and cooperative" during the interview, supporting finding that he voluntarily acquiesced). These facts all support the finding that, although the interviewing agents initiated the interview, Defendant voluntarily acquiesced in participating in the interview to its conclusion.[32]

Furthermore, none of the three aggravating factors weighs in favor of custody. The fourth factor does not aggravate in favor of custody, because there is no evidence that investigators engaged in strong-arm tactics or deceptive stratagems. As in Axsom, the officers were armed but did not display their weapons. Axsom, 289 F.3d at 502. The interviewing officers also did not use any deceptive stratagems, such as the good-cop, bad-cop routine. See United States v. Brown, 990 F.2d 397, 400 (8th Cir. 1993); United States v. Carter, 844 F.2d 368, 372 (8th Cir. 1989) ("Mutt and Jeff" technique contributed to police-dominated atmosphere (citing Miranda, 384 U.S. at 452, 455)). Moreover, the interviewing officers "asked straightforward questions and [Defendant] gave straightforward answers," Axsom, 289 F.3d at

---

[32] In fact, as already noted, Defendant interrupted the interview and went into the house to have a cigarette without objection by the officers. Of import here is that, having exercised the ability to stop the interview, whatever the reason therefore, Defendant then voluntarily returned and participated in continuing the interview to its conclusion.

502 (internal quotations omitted), and they did not make any promises to Defendant. Thus, the fourth factor does not aggravate in favor of a finding of custody.

Nor does the fifth factor aggravate in favor of a finding of custody, because the interview was not police dominated. In considering this factor, courts examine such considerations as the place and length of the interview. Griffin, 922 F.2d at 1352. The interview here took place on the porch of Defendant's girlfriend's residence, all while Defendant's girlfriend and her two children were also present and not separated from Defendant by law enforcement. Because the interview took place in such friendly confines, it is analogous to an interview in Defendant's own home, where there is a presumption that the interview is not police dominated. Cf. Czichray, 378 F.3d at 826-27 (8th Cir. 2004) (interview in defendant's home is presumptively not police dominated). The interviewing officers did not "assert[] their dominion over the interrogation site," Griffin, 922 F.2d at 1355, by, for example, separating Defendant from his girlfriend during the interview.

Defendant argues that the fact that other officers were waiting at the end of the driveway, and that one may have been watching the residence while he was being interviewed, created a police-dominated environment. (Def.'s Mem. Supp. Mot. Suppress Statements [Docket No. 87], at 8-9). However, the fact that other officers were in view does not mean that the interview was police dominated. See United States v. Lowen, 647 F.3d 863, 868 (8th Cir. 2011) (finding defendant was not in custody when "[o]nly two of the five officers present questioned Lowen, and the questioning occurred in Lowen's home").[33]

---

[33] Accord United States v. Wallace, 323 F.3d 1109, 1113 (8th Cir. 2003) ("the fifth indicium is whether the *questioning*, not the execution of the search warrant, was police dominated") (emphasis in original); Axsom, 289 F.2d at 503 ("While the execution of the search warrant was certainly police dominated, the interview between the two agents and [defendant] was not") (footnote omitted).

Finally, the interview was relatively brief, running just over 1 hour, and therefore, it was not so lengthy as to suggest a finding that it was police dominated. Czichray, 378 F.3d at 825, 830 (interview in defendant's home lasting nearly seven hours was not custodial).[34] Thus, the fifth factor does not weigh in favor of a finding of custody.

The sixth and final factor is the easiest to resolve: Defendant *was not arrested* at the conclusion of the interview, therefore this factor does not support a finding of custody.

Upon the totality of the circumstances, the Court finds that Defendant was not in custody when he spoke with SA Tabor and SA Anderson on July 24, 2011. Defendant was told at the outset that he was not under arrest, he voluntarily acquiesced to questioning, and there is no evidence that his freedom of movement was restrained. Defendant was at his girlfriend's residence, with his girlfriend and her children at all times present, and the interviewing agents used no strong-arm tactics or deceptive stratagems. The interview, although lasting a little more than an hour, was not inordinately long or in any way otherwise police dominated. Finally, Defendant was not arrested at the end of the interview.

Given the totality of the circumstances, a reasonable person in Defendant's position would not "have felt that he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). Moreover, the Defendant's freedom was not restrained to a degree associated with formal arrest requiring a Miranda warning. Finally, the circumstances of the interview were not so police dominated as to subvert the Defendant's free will to voluntarily participate in the interview.

## 2.  Defendant's written affidavit

Defendant argues that the affidavit that he signed should be suppressed as "fruit of the

---

[34] See also Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive") (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (interview lasting seven-and-a-half hours not unconstitutional)).

poisonous tree," because the interview during which the affidavit was signed was improper because he was not given a <u>Miranda</u> advisory.  (Def.'s Mem. Supp. Mot. Suppress Statements [Docket No. 87], at 9-10).  However, the Court already has found that Defendant was not in custody and voluntarily participated in the interview.  <u>See</u> Part III.C.1, <u>supra</u>.  Consequently, this argument fails, because <u>Miranda</u> is not applicable to non-custodial interaction with law enforcement.

Alternatively, Defendant argues that he was coerced into signing the affidavit.  (Def.'s Mem. Supp. Mot. Suppress Statements [Docket No. 87], at 10-11).

"Whether or not <u>Miranda</u> is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination."  <u>United States v. Pankey</u>, No. 07-cr-214, 2007 U.S. Dist. LEXIS 86785, at *11 (D. Minn. Oct. 25, 2007) (DWF/RLE) (Erickson, C.M.J.) (citing <u>Dickerson v. United States</u>, 530 U.S. 428, 433-34 (2000)), <u>adopted by</u> 2007 U.S. Dist. LEXIS 84319 (D. Minn. Nov. 13, 2007) (Frank, J.).  When analyzing voluntariness, the Court considers "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." <u>Dickerson</u>, 530 U.S. at 434.  Furthermore, a statement is involuntary if it "was extracted by threats, violence, or . . . promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired."  <u>United States v. Gallardo-Marquez</u>, 253 F.3d 1121, 1123 (8th Cir. 2001) (quotations and citations omitted).

Whether a defendant's will has been overborne is determined by looking at the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure.  <u>United States v. Pierce</u>, 152 F.3d 808, 812 (8th Cir. 1998).  Courts consider a multitude of factors including the age of the

defendant, the level of education of the defendant, the lack of advice to the accused on his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); see also United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (stating that "officers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. . . . None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation cause the defendant's will to be overborne" (quotations and citation omitted).).

The evidence in the record demonstrates that Defendant was not coerced into signing the affidavit. Defendant argues that he twice told the interviewing agents that he was "freaked out." (Def.'s Mem. Supp. Mot. Suppress Statements [Docket No. 87], at 11).[35] However, regardless of Defendant's subjective state of mind, the present record contains no evidence that the interviewing agents used "threats, violence, or . . . promises." Gallardo-Marquez, 253 F.3d at 1123.[36] Nor does the record contain any evidence that any of the Schneckloth factors were present in the case. The recording demonstrates that SA Tabor and SA Anderson explained that Defendant could amend any portion of the affidavit that he thought was inaccurate, and that he

---

[35] It is evident from a review of the recorded interview that this was a description of the Defendant's subjective reaction to the officers' initial arrival only. It is not reasonable to infer from a review of the whole of the recorded interview that this subjective description applied throughout the whole of the interview.

[36] Additionally, Defendant argues that after he told the interviewing agents that he was "freaked out," "they should have told him at a minimum, [sic] that he was free to leave, that his statement was voluntary, that he did not need to talk to law enforcement if he did not want to and that he could ask them to leave." (Def.'s Mem. Supp. Mot. Suppress Statements [Docket No. 87], at 11). However, Defendant also testified at the July 2, 2013, motions and evidentiary hearing that he "[did not] believe" the interviewing agents when they told him that they were not there to arrest him. If Defendant did take the interviewing agents at their word when they told him that he would not be arrested, the Court cannot conclude that further reassuring words would have assuaged the "freaked out" Defendant.

could add any information that he thought was important. Defendant readily responded that the affidavit "[p]retty much says it all."

In short, the Court already has determined that the interviewing agents did not use strong-arm tactics or deceptive stratagems, and that the interview was not "police dominated." See Part III.C.1, supra. The Court cannot then, on the same record, conclude Defendant's decision to sign the affidavit during the interview was involuntary or coerced.

Consequently, the Court recommends that the Defendant's Motion to Suppress Statements, Admissions and Answers [Docket No. 57] be **DENIED**.


## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Dismiss the Indictment [Docket No. 67] be **DENIED**;

2. Defendant's Motion to Dismiss Indictment due to Selective Prosecution, or for Additional Discovery [Docket No. 71] be **DENIED**;

3. Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 57] be **DENIED**.


Dated: August 30, 2013                                    s/Leo I. Brisbois
                                                          LEO I. BRISBOIS
                                                          United States Magistrate Judge


## N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by September 13, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for

each objection.  A party may respond to the objections within **fourteen days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.